**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CAREFIRST ADVANTAGE PPO, INC.,
CAREFIRST ADVANTAGE DSNP, INC.
1501 S. Clinton Street
Baltimore, MD 21224-5744

Plaintiffs,

v.

DEPARTMENT OF HEALTH AND HUMAN SERVICES
Hubert H. Humphrey Building
200 Independence Avenue, S.W.
Washington, D.C. 20201

CENTERS FOR MEDICARE & MEDICAID SERVICES
7500 Security Boulevard
Baltimore, MD 21244

Defendants.

Civil Action No. 1:26-cv-4026

# COMPLAINT

Plaintiffs CareFirst Advantage PPO, Inc. and CareFirst Advantage DSNP, Inc. (together, "CareFirst"), by and through their undersigned counsel, bring this Complaint seeking relief against Defendants the United States Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS") (together, "Defendants").

In support of this Complaint, CareFirst alleges as follows:

## INTRODUCTION

1. CMS administers the Medicare Advantage ("MA") program through private insurers that contract with the United States to deliver Medicare benefits to millions of beneficiaries. The MA plans offered by those private insurers—referred to here as Medicare

Advantage Organizations (or "MAOs")—are evaluated annually by CMS through its Star Ratings program, by which CMS rates each contract held by the MAO on a one-to-five-star scale. *See* 42 C.F.R. §§ 422.162(b), 422.166(h), 423.182(b), 423.186(h). CareFirst brings this action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, seeking to vacate CMS's 2027 Star Ratings for contracts H7379 and H8854. Those ratings were calculated using 26 measures that were unlawfully adopted and should be removed from consideration.

2. To calculate each contract's Star Rating, CMS evaluates every MA contract against a set of "measures" using a methodology covering quality, compliance, and related metrics. The resulting ratings are intended to both (1) signal coverage quality to beneficiaries, and (2) determine funding CMS remits to MAOs—through rebate retentions and Quality Bonus Payments ("QBPs")—in the year following the rating year (*i.e.*, the payments lag the rating year by one year).

3. QBPs and rebate retention dollars directly fund an MAO's ability to expand member benefits, lower premiums, and invest in quality improvement, ultimately shaping the competitiveness and value of the MA products available to beneficiaries.

4. On October 8, 2026, CMS released the "2027 Star Ratings"; those ratings in turn will dictate CareFirst's 2028 rebate retentions and QBPs.

5. By this action, CareFirst challenges CMS's calculation of its 2027 Star Ratings and asks the Court to set those ratings aside. Specifically, CareFirst challenges CMS's use of 26 measures to calculate the ratings for contracts H7379 and H8854: C04, C05, C06, C10, C11, C13, C14, C15, C17, C18, C20, C21, C23, C24, C25, C26, C27, C30, C31, D02, D05, D06, D08, D09, D10, D11. All of these measures were adopted without public notice-and-comment rulemaking as required by 42 U.S.C. § 1395hh(a)(2), and ten of the 26 fail for the additional reason that they were adopted in excess of CMS's statutory authority under 42 U.S.C. § 1395w-23(o)(4)(A).

6. In bringing this action, CareFirst does not ask the Court to write on a blank slate; rather, recent precedent supports this action. In May 2026, in *Clover Insurance Co. v. U.S. Department of Health & Human Services*, the United States District Court for the Southern District of Georgia held that CMS's use of 20 Star Ratings measures in the calculation of that plaintiff's 2026 Star Rating was unlawful. Those 20 measures were identified by the plaintiff as adversely affecting its Star Rating. The court held with respect to ten of the measures that CMS relied on data that, under the Medicare statute, it was not authorized to rely on. The court held with respect to the other ten measures that CMS was required, but failed, to adopt them via notice-and-comment rulemaking. *Clover Ins. Co.*, 2026 WL 1483515, at *25. The *Clover* court thus vacated the plaintiff's 2026 Star Rating and ordered CMS to recalculate it. CMS complied.

7. Notwithstanding the *Clover* decision, and despite having effectuated the *Clover* judgment by recalculating the 2026 Star Rating for the plaintiff in that matter, CMS proceeded to incorporate the same measures into its calculation of the 2027 Star Ratings for all MAOs *except* Clover.[1] That is, despite the *Clover* judgment being limited to Clover's *2026* Star Rating, CMS voluntarily calculated Clover's *2027 Star Rating* by excluding the measures the *Clover* court struck down. In doing so, CMS effectively conceded the legal infirmities identified by the *Clover* court. It compounded its unlawful actions both by ignoring the *Clover* precedent in calculating the 2027 Star Ratings for CareFirst (and all other MAOs but Clover), and by giving Clover special treatment for 2027.

---

[1] One measure—MTM Program Completion Rate for CMR; referred to by the alphanumeric "D11" for 2026 Star Ratings purposes—was subject to a planned removal for purposes of the 2027 Star Ratings. A different measure—Statin Use in Persons with Diabetes (SUPD)—holds the "D11" designation for 2027.

8. The 26 measures challenged here are unlawful for the same two reasons articulated by the *Clover* court. Congress has not expanded CMS's legal authority in the intervening months; no development has occurred that renders the measures challenged here any more lawful than the measures at issue in *Clover* (many of which are included in the 26 challenged here).

9. Using the 26 unlawful measures challenged here, CMS calculated 2027 Star Ratings of 2.5 for Contract H7379 and 3.0 for Contract H8854. If those 26 unlawful measures were instead left out of the calculation, CareFirst's 2027 Star Ratings would be 5.0 stars for contract H7379 and 4.0 stars for contract H8854.

10. The consequences of CMS's unlawful conduct are substantial. The lower Star Ratings translate into approximately $92 million in lost resources across 2028. These are funds that CareFirst could deploy directly to expand member benefits, reduce premiums, and invest in quality improvement. The harm to CareFirst is not exclusively financial; lower ratings carry meaningful reputational harm, which can in turn impact membership. CMS publishes Star Ratings through its Plan Finder tool, directly influencing beneficiary enrollment and other consumer decisions, and contracts rated 4.0 stars or above can offer enhanced benefits funded by higher QBPs, thereby shaping competitive positioning in the MA marketplace. By incorporating unlawful measures into the 2027 Star Ratings calculation, CMS cast CareFirst's ratings in a poorer light in the eyes of MA consumers relative to peer MAOs, undermining CareFirst's ability to compete for Medicare beneficiaries through enhanced benefits and the like.

11. Through this action, CareFirst seeks an order vacating its 2027 Star Ratings and directing CMS to recalculate those ratings excluding the 26 challenged measures.

## **JURISDICTION, VENUE, AND EXHAUSTION**

12. This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 because this

action arises under the APA, 5 U.S.C. § 701 *et seq.*, and raises questions under the Medicare statute, 42 U.S.C. § 1395 *et seq*.

13. Venue is proper in this Court under 28 U.S.C. § 1391(e) because this is an action against United States agencies.

14. On October 8, 2026, CMS published CareFirst's 2027 Star Ratings for Contracts H7379 and H8854, which constitutes final agency action.

15. No administrative process exists through which CareFirst may seek reconsideration of CMS's actions challenged by this Complaint.

16. CareFirst has standing because it offers plans whose 2027 Star Ratings were calculated using 26 measures that exceeded CMS's statutory authority or were adopted by CMS without regard to procedures required by law. Those unlawful measures impacted CareFirst's ratings, inflicting substantial economic harm and placing CareFirst at a competitive disadvantage in the MA marketplace.

17. CareFirst's improperly calculated Star Ratings will inflict substantial economic harm on CareFirst, amounting to approximately $92 million less in QBPs and rebate retention over the course of 2028.

## PARTIES

18. CareFirst Advantage PPO, Inc. is a Maryland corporation maintaining its principal place of business in Baltimore, Maryland. CareFirst Advantage DSNP, Inc. is a Maryland corporation maintaining its principal place of business in Baltimore, Maryland. Each offers health benefit products and, through contracts with CMS, furnishes coverage to Medicare beneficiaries under Parts C and D through Contracts H7379 and H8854, respectively.

a. Contract H7379, entered into with CMS by CareFirst Advantage PPO, Inc., serves

its 47,909 enrollees in Maryland and other states. Contract H7379 received a 2027 Star Rating of 2.5 stars.

b. Contract H8854, entered into with CMS by CareFirst Advantage DSNP, Inc., serves its 8,596 enrollees in Maryland. Contract H8854 received a 2027 Star Rating of 3.0 stars.

19. Defendant HHS is a department of the Executive Branch of the United States government charged with overseeing the Medicare program. Its headquarters are situated at 200 Independence Ave., S.W., Washington, D.C. 20201. HHS has delegated its authority to administer the Medicare program to CMS. *See* 66 Fed. Reg. 35437 (July 5, 2001).

20. CMS is the HHS component agency primarily responsible for the administration and oversight of the Medicare program. *See id.* Its headquarters are situated at 7500 Security Blvd., Baltimore, MD 21244.

## FACTUAL ALLEGATIONS

### I. Medicare Advantage

21. Medicare is a federal health insurance program established to serve Americans aged 65 and older, as well as qualifying individuals with disabilities. *See* 42 U.S.C. § 1395 *et seq.*

22. Medicare consists of four parts addressing distinct aspects of healthcare for its beneficiaries. Medicare Part A provides coverage for inpatient hospital stays, skilled nursing facilities, hospice care, and home health care. Medicare Part B provides coverage for outpatient care, physician visits, preventive services, home health care, and durable medical equipment. *See* 42 U.S.C. §§ 1395c through 1395i-6 (Part A); 42 U.S.C. §§ 1395j through 1395w-6 (Part B). Under Medicare Parts A and B—collectively referred to as “traditional” or “original” Medicare—the federal government serves as the insurer and directly reimburses providers for services rendered to enrolled beneficiaries.

23. As an alternative, a beneficiary may elect to enroll in Medicare Part C, known since 2003 as Medicare Advantage, in lieu of traditional Medicare. Congress established Medicare Part C through the Balanced Budget Act of 1997. *See* 42 U.S.C. § 1395w-21 *et seq.* Through the MA program, CMS contracts with private health insurers to furnish Medicare-covered benefits to enrolled beneficiaries, shifting the financial risk of benefit delivery away from the federal government and onto privately operated MAOs, which receive a fixed monthly payment for each enrolled member. *See* 42 U.S.C. § 1395w-23.

24. MAOs are required to furnish members with no less than the same level of benefits available under traditional Medicare. MAOs integrate coverage from both Parts A and B and frequently offer prescription drug coverage under Part D, which was enacted in 2003 and took effect in 2006 as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"), Pub. L. No. 108-173, 117 Stat. 2066 (2003). *See* 42 U.S.C. § 1395 *et seq.*

25. Among other programmatic reforms, the MMA established an annual bidding process. *See id.* § 1395w-23(a)(1)(B). Each year, MAOs submit a bid by the first Monday in June projecting the cost of delivering core Medicare benefits for the upcoming plan year, including overhead and profit. *See id.* § 1395w-24(a)(1)(A). If the bid falls below CMS's county-level benchmark, CMS refunds a portion of the savings to the MAO as a "rebate." These are dollars the MAO may direct toward supplemental benefits, premium reductions, or both. *See id.* § 1395w-23(a)(1)(E).

## II. <u>Star Ratings and their impact on MAOs</u>

### A. Medicare Star Rating calculations

26. CMS began publishing annual performance ratings for stand-alone Medicare Prescription Drug Plans in 2007. In 2008, CMS "introduced and displayed the Star Ratings for Medicare Advantage Organizations . . . for both Part C only contracts . . . and Part C and D

contracts (MA-PDs). Each year since 2008, [CMS has] released the MA Star Ratings [subsequently adding] [a]n overall rating combining health and drug plan measures" in 2011. 83 Fed. Reg. 16440, 16520 (April 16, 2018).

27. But even a decade before the launch of the Star Ratings program, MAOs were obligated to maintain "an ongoing quality assurance program" for the healthcare services furnished to their members. Pub. L. No. 105-33, § 4001, 111 Stat. 251, 291 (1997) (codified at 42 U.S.C. § 1395w-22(e)(1)). Congress expressly conferred upon CMS the authority to select the "quality and outcomes measures" that the Secretary "determine[d] to be appropriate" as components of plans' quality assurance programs. 42 U.S.C. § 1395w-22(e)(1), (e)(2)(A)(xii) (1997). That discretion generated uncertainty and confusion, as CMS proposed various quality measures and practice standards without constraint.

28. In 2003, Congress eliminated this uncertainty by codifying CMS's quality measures into statute. *See* MMA, Pub. L. No. 108-173, 117 Stat. 2066 (2003). These amendments confined CMS to requiring quality-measure data that were "the types of data that were collected by the Secretary as of November 1, 2003," permitting departure from those data types only upon submission of a report to Congress. 42 U.S.C. § 1395w-22(e)(3)(B).

29. In 2004, CMS recognized it was constrained under § 1395w-22(e), and that, prospectively, it would rely exclusively on its pre-existing, pre-2003 measurement systems addressing clinical quality, health outcomes, and beneficiary satisfaction: the Healthcare Effectiveness Data and Information Set ("HEDIS"), Health Outcomes Survey ("HOS"), and Consumer Assessment of Healthcare Providers and Systems ("CAHPS"). *See* 69 Fed. Reg. 46,866, 46,886 (Aug. 3, 2004) ("We interpret section 1852(e)(3)(B)(i) of the Act to mean that we can continue to require MA coordinated care plans to collect, analyze, and report their performance by

using the measurement systems that are currently required, such as HEDIS, Health Outcomes of Seniors (HOS), and CAHPS, as appropriate for the type of plan.”).

30. CMS inaugurated its Star Ratings system in 2007. In 2010, the Patient Protection and Affordable Care Act (“ACA”), Pub. L. No. 111-148, 124 Stat. 119 (2010), introduced the Quality Bonus Payment program and adopted the Star Ratings system as its implementing mechanism. Congress identified § 1395w-22(e) as the sole source of data for quality rating calculations, omitting the clause that had previously afforded the Secretary discretion to consider other measures. *See* 42 U.S.C. § 1395w-23(o)(4)(A).

31. Each contract’s overall Star Rating is a composite score ranging from 1 to 5 stars, including half-stars, derived by evaluating the contract’s performance on “measures” announced by CMS. Different measures carry different weight (assigned by CMS), and they combine to produce the contract’s single summary rating. CMS publishes its Star Rating methodology in annual sub-regulatory guidance documents called “Technical Notes,” which set forth the applicable measures and other key data used to assign measure-level scores. CMS revises these Technical Notes, and the measures they describe, outside of notice-and-comment rulemaking.

32. Because the overall Star Rating is a weighted average, performance on any single measure—particularly a heavily weighted one—can push a contract above or below a critical threshold. Contracts that reach the critical threshold score of 4.0 or better qualify for a QBP.

33. Thus, today, the Medicare “Star Ratings” program serves a dual purpose: it is CMS’s main vehicle for evaluating and publicizing MAO care quality while also embodying the financial incentive structure Congress designed to encourage quality-driven competition among MAOs.

**B. Rebate retentions and the Quality Bonus Payment**

34. As explained above, under the MA program, MAOs submit bids to CMS in early June of the year preceding the contract year (*e.g.*, bids for MA contract year 2028 will be due to CMS in June 2027). MAOs that bid below the applicable benchmark receive a "rebate" from CMS, which they may deploy to enhance benefits, reduce cost-sharing, or lower premiums.

35. How much of that rebate an MAO keeps depends directly on its Star Rating. Contracts rated below 3.5 stars (including unrated or new plans) retain 50% of the rebate amount. Contracts achieving a rating of at least 3.5 but below 4.5 stars retain 65%. Contracts attaining the highest tier of 4.5 stars or above retain the maximum 70% of the rebate, thereby rewarding higher-quality contracts with greater financial flexibility. This tiered structure means that a contract's Star Rating carries significant downstream consequences not only for its QBPs but also for its capacity to improve access, affordability, quality, and health outcomes.

36. Pursuant to 42 U.S.C. § 1395w-23(o), CMS remits a QBP to MAOs whose contracts achieve a Star Rating of 4.0 stars or above. The QBP takes the form of an elevated benchmark—the maximum per-member amount CMS will pay—which in turn enables the MAO to offer enhanced supplemental benefits and return excess payments to members as rebates.

37. For MAOs like CareFirst, the half-star differences in their Star Ratings for Contracts H7379 and H8854 add up to approximately $92 million in lost resources; this loss directly diminishes the benefits and programs that CareFirst can offer to its members.

**C. The Medicare Advantage cycle**

38. An MA contract's Star Rating for a given year dictates its rebate retention and QBP, if any, for the following contract year. Those anticipated rebates and QBP are factored into the bids MAOs submit to CMS the preceding June.

39. Relevant to this case, CMS released the 2027 Star Ratings for CareFirst's contracts

(and all other MAOs' contracts) on October 8, 2026. Those 2027 Star Ratings dictate CareFirst's rebate retentions and QBP for use in MA contract year 2028. The bids for the 2028 contracts are due to CMS in June 2027.

40. The following represents the typical schedule of key Medicare Star Ratings events:

| **2027 Star Ratings – Key Periods and Events** | |
|---|---|
| Calendar Year 2025 | Measurement period for the performance data that serve as a baseline for CareFirst's 2027 Star Ratings |
| June 1, 2026 | Statutory bid deadline for 2027, factoring in anticipated 2027 rebate retentions and QBP based on 2026 Star Ratings |
| Aug. 5, 2026 – Aug. 12, 2026 | Plan Preview 1 for 2027 Star Ratings |
| Sept. 8, 2026 – Sept. 15, 2026 | Plan Preview 2 for 2027 Star Ratings |
| Oct. 8, 2026 | 2027 Star Ratings Published |
| Oct. 15, 2026 | Annual Election Period commences |
| Jan. 1, 2027 | Medicare Advantage Open Enrollment commences |
| June 7, 2027 | Statutory bid deadline for 2028, factoring in anticipated 2028 rebate retentions and QBP based on 2027 Star Ratings |

## III. The *Clover* decision and CMS's response

41. On November 7, 2025, Clover Insurance Company filed suit in the U.S. District Court for the Southern District of Georgia, challenging its 2026 Star Rating on the ground that CMS had unlawfully adopted 20 measures used in calculating that rating.

42. Clover requested removal of the 20 measures on several bases, including that CMS impermissibly relied upon data sources outside of § 1395w-22(e) to calculate its Star Rating in

violation of 42 U.S.C. § 1395w-23(o)(4)(A) and failed to promulgate measures through notice-and-comment rulemaking, as required by 42 U.S.C. § 1395hh(a)(2). The court agreed. In an order entered on May 27, 2026, the court held that 20 measures on which CMS relied in calculating the 2026 Star Ratings were unlawful.

43. As to CMS's failure to comply with 42 U.S.C. § 1395w-23(o)(4)(A), the court held that the statute limits CMS's authority to base its quality rating calculations on measures that use data collected under Section 1395w-22(e), or CAHPS, HEDIS, or HOS. The court found that the plain language of the statute, as well as the "legislative history and general principles of agency power," supports this reading of the statute. Clover, 2026 WL 1483515, at *14. The court concluded that ten of the 20 measures challenged by Clover failed to comply with 42 U.S.C. § 1395w-23(o)(4)(A).

44. Specifically, the court stated that eight of the ten challenged measures did not rely on HEDIS, HOS, or CAHPS as primary sources of data. These included: D08, D09, D10, and D12, which are all based on Prescription Drug Event (PDE) data; C33 and D01, which are based on Call Center monitoring data; C32, which is based on Independent Review Entity data; and D11, which is based on Part D Plan Reporting data. Clover, 2026 WL 1483515, at *8-9.

45. As to D05 and D06, the court held that the primary data source for both measures is CAHPS; however, these measures use data collected under Part D (not Part C) authority at 42 U.S.C. § 1395w-104(d). Therefore, neither measure relies on data collected under 42 U.S.C. § 1395w-22(e). Clover, 2026 WL 1483515, at *9.

46. The *Clover* court concluded that the ten remaining measures challenged by Clover were invalid because CMS failed to promulgate them through notice-and-comment rulemaking. In so concluding, the court held that Star Ratings measure specifications qualify as "statements of

policy" that establish or change a substantive legal standard for purposes of § 1395hh(a)(2) insofar as they "define the scope of MAOs' legal rights to rebates" and "govern payment for services." Clover, 2026 WL 1483515, at *23.

47. The court vacated Clover's 2026 Star Rating and directed CMS to recalculate it consistent with its holdings.

48. The chart below identifies all the measures held to be unlawful by the *Clover* court:

| | |
|---|---|
| **Category 1:** Measures Based on Non-§ 1395w-22(e) Data Sources | • **C32** (Reviewing Appeals Decisions);<br>• **C33** (Call Center – Foreign Language Interpreter and TTY Availability);<br>• **D01** (Call Center – Foreign Language Interpreter and TTY Availability);<br>• **D05** (Rating of Drug Plan);<br>• **D06** (Getting Needed Prescription Drugs);<br>• **D08** (Medication Adherence for Diabetes Medications);<br>• **D09** (Medication Adherence for Hypertension (RAS antagonists));<br>• **D10** (Medication Adherence for Cholesterol (Statins));<br>• **D11** (MTM Program Completion Rate for CMR); and<br>• **D12** (Statin Use in Persons with Diabetes). |
| **Category 2:** Measures Established or Materially Changed Without Notice-and-Comment Rulemaking | • **C03** (Annual Flu Vaccine);<br>• **C04** (Improving or Maintaining Physical Health);<br>• **C05** (Improving or Maintaining Mental Health);<br>• **C15** (Reducing the Risk of Falling);<br>• **C16** (Improving Bladder Control);<br>• **C22** (Getting Needed Care);<br>• **C23** (Getting Appointments and Care Quickly);<br>• **C24** (Customer Service);<br>• **C25** (Rating of Health Care Quality); and<br>• **C27** (Care Coordination). |

49. CMS did not immediately appeal that decision and seek a stay. Instead, within two weeks of the order, CMS complied with it by recalculating Clover's 2026 Star Rating as ordered by the court.

50. Nearly two months later, on July 21, 2026, CMS filed a notice of appeal to the United States Court of Appeals for the Eleventh Circuit. *See Clover Ins. Co. v. DHHS*, No. 2:25-

cv-00142 (S.D. Ga.), Notice of Appeal, ECF No. 67 (July 21, 2026). CMS subsequently requested expedited briefing, which the court granted. *See Clover Ins. Co. v. DHHS*, No. 26-12553 (11th Cir.), Mot. to Restart or Set Briefing Schedule and to Expedite Oral Argument, ECF No. 13 (Aug. 19, 2026); *Clover Ins. Co. v. DHHS*, No. 26-12553 (11th Cir.), Order, ECF No. 15-1 (Sept. 2, 2026). Argument has been scheduled for January 21, 2027. *Clover Ins. Co. v. DHHS*, No. 26-12553 (11th Cir.), Oral Argument Calendar, at 1 (Nov. 6, 2026).

## IV. <u>CareFirst's 2027 Star Ratings</u>

### A. Publication of 2027 Star Ratings in October 2026

51. On October 8, 2026, CMS published the 2027 Star Ratings. With respect to CareFirst, CMS assigned an overall 2027 Star Rating of 2.5 stars to Contract H7379.

52. Notwithstanding the Clover decision and CMS's implementation of the judgment for Clover, CMS—in calculating the 2027 Star Ratings—relied upon measures that were not based on data collected under 42 U.S.C. § 1395w-22(e), including those specifically addressed in Clover, and that were adopted without regard to the notice-and-comment rulemaking requirement set forth in 42 U.S.C. § 1395hh(a)(2).

53. The one exception for 2027 was Clover. For Clover's 2027 Star Rating—but no other MAO's 2027 Star Rating—CMS again removed the measures held unlawful in *Clover* despite no legal requirement to do so: the *Clover* lawsuit—and the *Clover* court's order—only addressed Clover's 2026 Star Rating. The *Clover* order could not possibly have addressed Clover's 2027 Star Rating because CMS only announced the 2027 Star Ratings on October 8, 2026—well after the court's order was published on May 27, 2026.

54. By voluntarily removing measures for Clover's 2027 Star Ratings, CMS has implicitly conceded that it implemented these measures in violation of the law—if not, there would be no reason to exclude them from Clover's 2027 Star Ratings.

55. Nothing has changed in the past year such that the approach to Star Rating measures found unlawful in *Clover* might be considered lawful now, for purposes of calculating any MAO's 2027 Star Ratings. Congress has also not expanded CMS's legal authority over the Star Rating program in the intervening period. Nevertheless, CMS proceeded to calculate all 2027 Star Ratings (except Clover's) as though the *Clover* decision had never been issued.

56. CareFirst faces injury from a different combination of measures, which are unlawful for the same reasons articulated by the Court in *Clover*. Specifically, all of the measures CareFirst challenges are defective because they were not promulgated through notice-and-comment rulemaking:

| | |
|---|---|
| Measures Established or Materially Changed Without Notice-and-Comment Rulemaking | • **C04** (Improving or Maintaining Physical Health);<br>• **C05** (Improving or Maintaining Mental Health);<br>• **C06** (Monitoring Physical Activity);<br>• **C10** (Osteoporosis Management in Women who had a Fracture);<br>• **C11** (Diabetes Care – Eye Exam);<br>• **C13** (Kidney Health Evaluation for Patients with Diabetes);<br>• **C14** (Controlling Blood Pressure);<br>• **C15** (Reducing the Risk of Falling);<br>• **C17** (Plan All-Cause Readmissions);<br>• **C18** (Statin Therapy for Patients with Cardiovascular Disease);<br>• **C20** (Follow-up after Emergency Department Visit for People with Multiple High-Risk Chronic Conditions);<br>• **C21** (Getting Needed Care);<br>• **C23** (Customer Service);<br>• **C24** (Rating of Health Care Quality);<br>• **C25** (Rating of Health Plan);<br>• **C26** (Care Coordination);<br>• **C27** (Complaints about the Health Plan);<br>• **C30** (Plan Makes Timely Decisions about Appeals);<br>• **C31** (Reviewing Appeals Decisions);<br>• **D02** (Complaints about the Drug Plan);<br>• **D05** (Rating of Drug Plan);<br>• **D06** (Getting Needed Prescription Drugs);<br>• **D08** (Medication Adherence for Diabetes Medications);<br>• **D09** (Medication Adherence for Hypertension (RAS antagonists));<br>• **D10** (Medication Adherence for Cholesterol (Statins));<br>• **D11** (Statin Use in Persons with Diabetes (SUPD)). |

57. These measures establish a substantive legal standard insofar as they are the deciding principle for payments in the form of QBPs and rebates that plans receive from CMS, effectively determining the financial rights of MAOs. They are furthermore critical to the MAOs' ability to negotiate higher reimbursement rates for providers, expand provider networks and benefits, and reduce costs for members.

58. Ten of the 26 measures are also unlawful because they rely on data that were not "collected under section 1395w-22(e)" as required by 42 U.S.C. § 1395w-23(o)(4)(A).

| | |
|---|---|
| Measures Based on Non-§ 1395w-22(e) Data Sources | • **C27** (Complaints about the Health Plan);<br>• **C30** (Plan Makes Timely Decisions about Appeals);<br>• **C31** (Reviewing Appeals Decisions);<br>• **D02** (Complaints about the Drug Plan);<br>• **D05** (Rating of Drug Plan);<br>• **D06** (Getting Needed Prescription Drugs);<br>• **D08** (Medication Adherence for Diabetes Medications);<br>• **D09** (Medication Adherence for Hypertension (RAS antagonists));<br>• **D10** (Medication Adherence for Cholesterol (Statins));<br>• **D11** (Statin Use in Persons with Diabetes (SUPD)). |

59. Due to CMS's improper inclusion of these 26 measures, CareFirst's Contract H7379 received a Star Rating of 2.5 stars, and Contract H8854 received a Star Rating of 3.0 stars. Had CMS not included these measures, CareFirst projects that its H7379 contract would have received a 2027 Star Rating of 5.0 stars, and projects that its H8854 contract would have received a 2027 Star Rating of 4.0 stars. These contracts would have been entitled to substantially larger rebates and QBPs.

**B. Reputational harm caused by the publication of unlawfully derived Star Ratings**

60. Further, CMS's publication of Star Ratings distorted by its inclusion of 26 unlawful measures has caused, and continues to cause, significant reputational harm to CareFirst. Star Ratings are publicly disclosed on CMS's Medicare Plan Finder tool, where current and prospective Medicare beneficiaries routinely consult them when making enrollment decisions. A depressed Star Rating (particularly one that falls below the 4.0-Star threshold) signals to the market that an MAO's quality of care is substandard, regardless of whether that rating accurately reflects the MAO's actual performance. At the same time, because Star Ratings are relative, peer MAO ratings have been artificially inflated by differing CMS calculations, further distorting how the CareFirst plans are perceived and casting them in poorer light.

61. The reputational consequences of a below-threshold Star Rating extend beyond the

individual enrollment cycle. Brokers and third-party marketing organizations that direct Medicare beneficiaries toward specific plans may deprioritize or decline to market plans rated below 4.0 stars, reducing CareFirst's visibility and competitiveness in the marketplace. Employers and plan sponsors that offer MA options to retirees may similarly rely on Star Ratings as a proxy for plan quality, and a suppressed rating diminishes CareFirst's ability to compete for and retain those relationships.

## CLAIMS FOR RELIEF

### COUNT I: AGENCY ACTION TAKEN WITHOUT OBSERVANCE OF PROCEDURE REQUIRED BY LAW (5 U.S.C. § 706(2)(D))

62. Plaintiffs incorporate by reference paragraphs 1 through 61 above as though fully set forth herein.

63. Under 5 U.S.C. § 706(2)(D), an agency may not act without observance of procedure required by law.

64. Congress has mandated that CMS engage in notice-and-comment rulemaking and codify "by regulation" any "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under [Medicare]." *Azar v. Allina Health Servs.*, 587 U.S. 566, 570 (2019) (quoting 42 U.S.C. § 1395hh(a)(2)).

65. Moreover, by its own regulation, CMS is obligated to adopt new quality measures through notice-and-comment rulemaking. *See* 42 C.F.R. § 422.164(c)(2) ("In advance of the measurement period, CMS will announce potential new measures and solicit feedback through the process described for changes in and adoption of payment and risk adjustment policies in section

1853(b) of the Act and then subsequently will propose and finalize new measures through rulemaking."); *see also id.* § 422.164(d) (requiring notice-and-comment rulemaking for substantive updates to existing measures); *see also* 42 C.F.R. §§ 423.184(c)(2), (d).

66. CMS did not undertake the required notice-and-comment rulemaking and codify "by regulation" the 26 measures challenged here in calculating its 2027 Star Ratings. Each of the measures challenged here establishes a substantive legal standard governing CareFirst's rebate retention and QBP eligibility—and therefore governing "the payment for services" within the meaning of 42 U.S.C. § 1395hh(a)(2)—yet none was promulgated by regulation.

67. Because CMS derived the 2027 Star Ratings for Contracts H7379 and H8854 using measures adopted without observance of procedure required by law (*i.e.*, notice and comment), the Court should vacate the 2027 Star Ratings for those contracts and direct CMS to recalculate its Star Ratings without regard to these measures.

**COUNT II: AGENCY ACTION NOT IN ACCORDANCE WITH LAW, IN VIOLATION OF STATUTORY RIGHT, IN EXCESS OF STATUTORY AUTHORITY**
**(5 U.S.C. § 706(2)(A), (C))**

68. Plaintiffs incorporate by reference paragraphs 1 through 61 above as though fully set forth herein.

69. Congress restricted the data upon which CMS's Star Ratings may be based to data for which an MAO provides collection, analysis, or reporting as part of its quality improvement program. 42 U.S.C. § 1395w-23(o)(4)(A) (requiring Star Ratings to be based on "data collected under section 1395w-22(e) of this title").

70. CMS calculated the 2027 Star Ratings for Contracts H7379 and H8854 using measures that are based on data not collected under § 1395w-22(e). Specifically, ten of the 26 measures challenged in this Complaint (C27, C30, C31, D02, D05, D06, D08, D09, D10, D11)

were calculated utilizing data generated outside the scope of what CMS is permitted to use under § 1395w-22(e) to calculate Star Ratings.

71. Because CMS calculated CareFirst's 2027 Star Ratings for Contracts H7379 and H8854 using data not collected under § 1395w-22(e), the Court should vacate the unlawful 2027 Star Ratings for these two contracts.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and:

a) Declare that measures C04, C05, C06, C10, C11, C13, C14, C15, C17, C18, C20, C21, C23, C24, C25, C26, C27, C30, C31, D02, D05, D06, D08, D09, D10, D11 were adopted by CMS without observance of procedure required by law because CMS failed to adopt those measures through public notice and comment;

b) Declare that measures C27, C30, C31, D02, D05, D06, D08, D09, D10, D11 were adopted in excess of CMS's statutory authority because those measures were not derived from data collected under 42 U.S.C. § 1395w-22(e), as required by 42 U.S.C. § 1395w-23(o)(4)(A);

c) Vacate the 2027 Star Ratings of Contracts H7379 and H8854 and order CMS to recalculate the overall 2027 Star Rating for each contract excluding the 26 unlawful measures identified in this Complaint;

d) Direct CMS to determine all 2028 rebates for Contracts H7379 and H8854 consistent with the recalculated Star Ratings;

e) Order CMS to permit Plaintiffs to revise any previously submitted MA bid(s) necessary to effectuate the judgment, consistent with this Court's order, the recalculated Star Ratings, and the revised QBPs and rebates; and

f) Award Plaintiffs such other and further relief as the Court may deem just and proper, including costs and fees, as permitted by law.

*[Signature Page Follows]*

Dated: November 13, 2026

/s/ Daniel W. Wolff
Daniel W. Wolff
DWolff@crowell.com
D.C. Bar No. 486733
**Crowell & Moring LLP**
600 Fifth Street, N.W.
Washington, DC 20001
Telephone: (202) 624-2621

Steven D. Hamilton (*pro hac vice* forthcoming)
StevenHamilton@crowell.com
Illinois Bar No. 6289663
**Crowell & Moring LLP**
300 N. LaSalle Drive, Suite 2500
Chicago, IL 60654
Telephone: (312) 379-7615